MAHONEY *v.* BOARD OF SUPERVISORS OF ELECTIONS OF CALVERT COUNTY

MAHONEY *v.* BOARD OF SUPERVISORS OF ELECTIONS OF BALTIMORE CITY

DORSEY *v.* BOARD OF SUPERVISORS OF ELECTIONS OF BALTIMORE CITY

(Three Appeals in Separate Records)

[Nos. 51-53, October Term, 1954 (Adv.)].

*Decided, per curiam, July 26, 1954.*

*Opinion filed October 8, 1954.*

The causes were argued before BRUNE, C. J., and DELAPLAINE, COLLINS and HAMMOND, JJ.

*Clarke Murphy, Jr.,* and *Francis B. Burch,* with whom was *Philip H. Sachs* on the brief, for George P. Mahoney in the Calvert County Case.

*Daniel B. Chambers, Jr., Clarke Murphy, Jr.,* and *Francis B. Burch,* with whom were *Herman Pumpian* and *Philip H. Sachs* on the brief, for George P. Mahoney in the Baltimore City Case.

*Gately Flynn* and *William O. E. Sterling,* with whom were *Philip H. Dorsey, Jr., pro se,* and *Dorsey & Sterling* on the brief, for Philip H. Dorsey, Jr.

*Frank T. Gray* for the Board of Supervisors of Elections of Calvert County.

*Frank T. Gray* and *William C. Walsh* for Harry Clifton Byrd, the opposing candidate for the Democratic nomination for Governor of Maryland, in the Calvert County Case.

*J. Edgar Harvey, Deputy Attorney General,* and *James H. Norris, Jr., Special Assistant Attorney General,* with whom was *Edward D. E. Rollins, Attorney General,* on the brief, for the Board of Supervisors of Elections of Baltimore City in the Case appealed by George P. Mahoney.

*J. Edgar Harvey, Deputy Attorney General,* with whom were *Edward D. E. Rollins, Attorney General,* and *James H. Norris, Jr., Special Assistant Attorney General,* on the brief, for the Board of Supervisors of Elections of Baltimore City in the Case appealed by Philip· H. Dorsey, Jr.

HAMMOND, J., delivered the opinion of the Court.

At the primary election held June 28, 1954, George P. Mahoney sought the right to become the Democratic nominee for the office of Governor of Maryland, and Philip H. Dorsey, Jr. was a candidate of the same party for Attorney General. On the face of the returns, both were unsuccessful. Seeking to change the results, under the procedure established by Art. 33, Sec. 65, of the Code (1951), Mahoney filed petitions for the review and recount of the ballots cast in Calvert County and in the Fourth District of Baltimore City, and Dorsey filed a similar petition as to the ballots cast in ·the Fourth and Fifth Districts of Baltimore City. During the progress of the recount in Calvert County, where paper ballots are used, Mahoney demanded that the Supervisors of Elections compare in detail the registration books with the poll books, in the presence of his counsel. The Supervisors refused. He filed a petition for *mandamus* in the Circuit Court for Calvert County, setting forth the matters which have been stated, adding: "that it is important to your petitioner to examine said poll books and compare them with said registration books * * *", and alleging that the action of the Board in refusing the examination was arbitrary, illegal and unreasonable. The petition was demurred to; the court sustained the demurrer and then entered judgment for the respondents.

Mahoney, after filing his petition for review and recount with the Supervisors of Elections of Baltimore City, requested them to permit him to compare in detail the voting authority cards and the precinct binders, and to examine the oaths taken by the judges of election contained in the Judges' Oath Book, the affidavits filed

by voters desiring assistance in voting, the affidavits filed by voters appearing on the "supplemental list of voters", and finally, the list of judges of election who served in the primary. The Supervisors refused all of the requests and a petition for *mandamus* was filed in the Superior Court of Baltimore City to require them to comply. It was alleged that the petitioner desired the comparison and examinations to determine the number of persons who voted, to see if some not "legally registered" did vote, and if the persons who voted were actually those they purported to be. This petition was demurred to; the court sustained the demurrer and entered judgment for the respondents.

Dorsey filed a similar petition in the Superior Court of Baltimore City, the allegations of which differed from those of Mahoney only in that Dorsey set forth that he: "* * * believes and verily avers that fraud has been committed by various election officials and other people and that said fraud would be such that this court would set aside the vote in several precincts which would change the final result of the said 4th and 5th Legislative Districts of Baltimore City." At the hearing, the petition was added to to allege that the fraud consisted in letting many people vote who were not authorized to do so, particularly some twenty-six known persons. It was also averred that in several precincts the public counters of the voting machines indicated that more votes were cast than there had been voting authority cards issued. The petition, after amendment, was demurred to; the demurrer was sustained and judgment entered for the respondents.

An appeal was taken in each of the three cases. They were argued together. After full consideration which followed the argument, we affirmed the judgment in each case by a *per curiam* order. The reasons for those actions follow.

The relief sought in the Calvert County case was the right to compare in detail the poll books with the registration books. In Baltimore City, the appellants de-

sired similar relief (the comparison of the voting authority cards and the permanent registration cards), as well as the right to see other data. We were told at the argument that after the filing of the petitions, the appellants had been permitted to see everything that they desired except the voting authority cards. Later the Court was advised that, in addition, Dorsey had been granted the right to see the voting authority cards and to make the comparison he desired. Thus, he has been afforded complete relief and, in substance, his case has become moot. There remains the question as to whether, in jurisdictions where paper ballots are used, a candidate has the right to require the comparison of poll books and registration books in the recount authorized under Art. 33, Sec. 65, of the Code (1951), and similarly whether in Baltimore City, under such circumstances, a candidate has the right to compare, or compel the authorities to compare, the voting authority cards and the permanent registration cards. We think that the Legislature, in providing the right to the recount and in setting up the mechanics by which it was to be achieved, neither contemplated nor provided for the procedure which the appellants sought. We reached these conclusions on the basis of the language of the section involved, its history and its place in the statutory plan of registration and voting.

Sec. 65 of Art. 33 provides that any candidate in a primary election who appears to be defeated on the face of the returns may petition: "* * * for an appeal from and review of the action and decision of the judges of election in *counting the ballots* and for a *recanvass and recount* of the ballots cast * * *." It provides that upon the filing of a petition, accompanied by an affidavit from the officers of election or by watchers, challengers or by other persons setting forth: "acts of fraud, mistake, error or irregularity in *making said count or returns* by the Judges of Election * * *", the supervisors shall produce before them: "the ballot boxes returns, tally-sheets and paraphernalia of said election, and/or ascer-

tain, in the manner provided by Section 104 of this Article, the votes recorded upon the voting machines, and shall proceed forthwith in a summary way without answer, pleading or technicality and without requiring any evidence to be taken or proof submitted, to review the actions of the Judges of Elections and recount the ballots in those precincts named in said petition * * *, in which paper ballots are used." (Emphasis supplied). It is manifest that the language quoted, and emphasized, as well as from all the language of the section, that the supervisors of elections are to do again what the judges of election did, pursuant to statute, immediately subsequent to the closing of the polls, and that what the Legislature has authorized and directed them to do is no more. As Judge Gray well put it in his opinion in the Calvert County case: "The entire machinery set up in this statute deals with a review of the counting of the ballots and is obviously intended to permit a defeated candidate in a close election to have the action of the judges which necessarily occurred under a certain amount of pressure and which might have been made without the close scrutiny that possibly would be available in a more leisurely count, to have their action reviewed by a tribunal set up in the statute, namely, the Board of Election Supervisors."

In paper ballot jurisdictions what the judges of election do, in essence, is to check the number of persons who voted against the number shown by the entries in the registration books to have voted, and then to count the ballots, deciding which are in proper form and which are not and so to ascertain the result of the voting for each office or proposition, then certifying the same and forwarding the certification to the proper officials. In the jurisdictions in which voting machines are used, the number of those who have voted, as shown by the counters of the machines, is checked against the number of voting authority cards issued and the results of the voting as to candidates and questions are ascertained from the inspection of the machines, then similar certi-

fications are made, and forwarded after the polls close. Judges of election in either case are not authorized to, nor do they, attempt to ascertain whether or not particular individuals voted or did not vote, and we think that the supervisors of election in a recount have no greater power. It is to be noted that Sec. 65 (c) provides that the supervisors shall: "proceed forthwith in a summary way without answer, pleading or technicality and *without requiring any evidence to be taken or proof submitted * * *"* (emphasis supplied) to recount the ballots. These directions lend weight to the conclusion that the supervisors are only to do again substantially what the judges did following the closing of the polls.

In 1911, in *Foxwell v. Beck,* 117 Md. 1, despite the provisions of the then very new statute requiring that primary elections: "shall be held and conducted and determined * * *" as are general elections, this Court held that the law did not contemplate or provide for contested election procedures, or for recounts, in primary elections. The Court said: "If by experience it be found necessary to adopt some method of procedure for a recount or contest, in order to protect candidates for nominations against fraud, beyond what the statutes against criminal offences afford, some less cumbersome and more expeditious plan than that now in Article 33 will doubtless be provided." The Legislature was not slow to adopt this suggestion. In 1912, by Chapter 2 of the Acts of that year, it enacted what is now Sec. 65 of Art. 33, and ended the enactment with this language: "Nothing in this section shall affect or prejudice any rights of any person to contest the result of any primary election or to institute proceedings to invalidate the same." The same Legislature by the same Act directed that the provisions of the general election law governing contests of election were to be expressly applicable to primaries. The same Legislature also enacted, by Chapter 228 of the Acts of that year, what is now codified as Sec. 175 of Art. 33. This provides that at any time within thirty days after the date of any election or

primary election, any defeated candidate at such election or any ten qualified voters at such election, may present to the Circuit Court of a County or to the Superior Court of Baltimore City, a petition setting forth under oath that: "corrupt practices, contrary to the provisions of any section of this Article, were committed at or preliminary to such election * * *" and praying that the facts alleged may be inquired into. The Court is given full authority to inquire into all the facts. It is directed to try and determine the case most expeditiously. The procedures which are to follow are specified in respect to the various offices, and under certain circumstances, an election may be declared void.

Certainly the Legislature, in providing for the recount under Sec. 65 of Art. 33 did not contemplate that an election contest was to occur or could be had by virtue of that section. Whatever the practical difficulties in the way of an election contest in a primary, to which the Court referred in *Foxwell v. Beck, supra,* the Legislature of 1912 nevertheless clearly intended to provide for such contests in primaries, and to the provisions for the right of such contest, they added the right to a recount, which is far more limited in purpose and scope. A comparison of the poll books with the registration books, or of the voting authority cards with the permanent registration cards, has no place in a recount, as such. The only purpose the appellants could have had in desiring such comparison would have been to ascertain whether improper voters cast ballots or whether proper voters were denied the right to vote. Relief on such grounds must be sought in forums and by procedures for the contesting of elections and not in a recount and recanvass proceeding.

A later evidence of legislative intent offers itself. In 1937, Sec. 65 was amended to provide that as part of the recount, the votes on the voting machines should be ascertained in the manner provided by what is now Sec. 104 of Art. 33. This procedure requires the supervisors, upon notice in writing of any contest as to the

result of an election, to inspect and examine the voting machines involved in the presence of the principals, or their authorized representatives, and directs them to make: "a record of the votes for such office upon said machines", which they shall duly certify as correct by the affixing of their signatures. The record thus made is preserved for use as evidence of the votes cast on the machines for the office involved and is to be received in evidence as fully as if given by oral testimony of the persons who signed the certification or by production of the machine in court or before the board. The appellants argue that a recount would be meaningless if it consists of a mere ministerial inspection and verification of figures on the machine. To this argument, they add that the requirements of Sec. 65, that there is to be produced before the supervisors all "paraphernalia" of an election, shows that a recount is to be more than the literal meaning of the word implies. We think, however, that Art. 33 as a whole shows, as would be expected, that the procedure where voting machines are used is to be as nearly analogous as is possible to that where paper ballots are used. From the legislative direction that a recount of the votes in voting machine jurisdictions was to include an inspection and verification of the votes shown on the machines, an inference follows that it was restating *mutatis mutandis,* the procedure in instances where paper ballots were to be recounted. In both cases, the "paraphernalia" of an election are pertinent because in paper ballot jurisdictions, the number shown as voting by the registration book is checked against the number who did vote, disclosed by the poll book; and where voting machines are used, the number of voting authority cards is similarly checked against the permanent registration cards figure and that shown by the voting machine counters. In the case at bar, the appellants were shown the totals on the registration books and the poll books, as well as the number of voting authority cards and the number of people who voted. The paraphernalia of the election were properly used—

but not used as the appellants desired, to permit individual comparison, name by name.

The presence of the recount section in the statutory plan for the registration of voters and their casting of ballots at elections emphasizes this conclusion. Art. 33 contains provisions calculated to permit on the registration books only the names of those persons who have the qualifications which the law requires for voting in the area. The officers of registration come from different political parties. Oaths are required of all those who seek to register, to the effect that they will fully and truthfully answer the questions put to them, and it is provided that any voter shall be permitted to be present at the place of registration and "have the right to challenge any applicant". Sec. 18 of Art. 33. Before elections, the Board of Registry must, at stated times, hear applications for change of registration or challenges of the right of named individuals to vote. There is provided an appeal to court for any person aggrieved by administrative action. Thus, the law makes every provision for the correctness and validity of the voting lists.

Sec. 75 of Art. 33 provides that each political party shall have the right to designate and keep a challenger and watcher at each place of registration and voting, who shall be given a position which will "enable them to see each person as he offers to register or vote, and they shall be protected in the discharge of their duty by the judges of election and the police." This section further provides that: "Such challenger or watcher shall have the right to remain in the polling-room outside the rail * * * from the time the polls are opened until they are closed, and after that time he shall be permitted to remain within the rail until the returns are completed * * *"; and further, that: "Citizens other than accredited challengers or watchers who desire to challenge the vote of any person then inside the polling-room shall be permitted to enter said room for that purpose * * *". Sec. 79 of Art. 33 prescribes the actual machinery of the vote. The person applying for the

ballot gives his name and address. The judge must then repeat it in a loud and distinct voice. If the other judges find the name on the registers, they repeat the name. The voter is then given a signed or initialled ballot and retires to cast his vote. Under Sec. 82 of Art. 33, anyone claiming to be on the registry of voters may have his right to vote challenged. The person challenging shall assign his reason therefor, and the person offering to vote is then put under oath to answer questions. The section provides that no one who is not registered as a qualified voter shall be entitled to vote or to receive a ballot.

Thus, not only may accredited challengers or watchers challenge the right to register or the right to vote of any individual but so may any interested citizen. It is by this process, buttressed by the sanctions of the statutes making it a criminal offense to violate the election laws, that the Legislature contemplates that the elections will be kept fair and accurate. If fraud or misconduct is detected by virtue of the opportunity for detection offered by the holding of registrations and elections in public, the law provides a remedy in the right to contest the election. If the judges of election, after the polls are closed, have made mistakes in the counting, canvassing or certifying of paper ballots or votes cast by a voting machine, the law provides a remedy in a primary election by virtue of the process established by Sec. 65 of Art. 33. The two procedures complement each other. The recount was not designed to permit candidates to seek out evidence of fraud or misconduct to be made the basis of an election contest.